interest in continuing education and that he had been accepted into a program prior to his service with the Weston Police Department. Complaint ¶58. Furthermore, there is nothing dishonest about what is noted on Officer Filush's resume. It simply states, "University of New Haven, Masters Program – Public Administration – not completed." See Exhibit 7. The defendant's use of the fact that the plaintiff stated on his resume that he attended, but did not complete, a Master's Degree program to justify reducing his oral exam score and, thereby, making sure he was not one of the final three candidates to be considered for the Sergeant's position, clearly raises a question of fact about the credibility of the defendant's purported non-discriminatory reasons for its actions.

### (a) The plaintiff has established that there is a question of fact as to whether the non-discriminatory reasons offered by the defendant were a pretext for discrimination

Once the employer produces sufficient evidence to support a non-discriminatory explanation for its decision, the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Reeves v. Sanderson, 530 U.S. 133, 143 (2000), quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). "That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" Id. quoting Burdine, 450 U.S. at 256.

The defendant claims "there is no evidence of pretext." Interestingly, the defendant devotes two and a half pages extracting language from almost every Court other than the Second Circuit but does not cite a single case from the Second Circuit. Rather, it throws out conclusory statements, claiming: (1) the Board of Police Commissioners made the final determination regarding promotions; and (2) Chief Land's comments were "stray remarks."

The Board of Police Commission ultimately decides who will be promoted to Sergeant. However, as in Bickerstaff, there is a question of fact concerning what Chief Land's influence was upon the decision-making process. Chief Land was an active participant in the oral part of the examination. Complaint ¶62. His involvement runs as far as preparing questions for the oral examiners. Complaint ¶62. Chief Land ranks the

27

candidates and candidly gives the Commissioners his opinion. Complaint ¶62. As Commissioner William Brady observed, "it's going to be his person ... there is no reason why he shouldn't be there." See Exhibit 18 at 18.

Chief Land's age-related discriminatory statements date back to the early 1990s, when he characterized one group of police chiefs as "the old guys" and another group of police chiefs which he belonged to as "the Young Turks." See Exhibit 5 at 92-93. In February 2002, Chief Land told the Board of Finance Committee that "[police] officers [were] getting up there in age ... our average is 40-something." See Exhibit 13. Chief Land also stated that "new" employees were more desirable because they "get less vacation and take less sick time." See Exhibit 13. Chief Land has made it clear that he did not want the "old guys" training the "new guys." See Exhibit 8, ¶9. Chief Land also told Commissioner Goldberg just weeks before the Commission promoted Officer Daubert to Sergeant that morale would improve if they got "rid of the old guys." See Exhibit 5 at 74. The fact that Chief Land influenced a selection process that led to the plaintiff's exclusion as a finalist raises a question of fact as to whether the plaintiff's age played a part in his exclusion.

Under the defendant's own criteria for evaluating candidates for the Sergeant position, Chief Land played a vital role even if the Board of Police Commissioners made the ultimate decision as to which candidates to promote to Sergeant. For example, in light of Chief Land's desire to "get rid of the old guys" and replace them with "young guys," lets assume he told the Police Commissioners that he was ranking the candidates for Sergeant based on their age, with the highest ranking going to be the youngest candidate and the lowest rating going to be the oldest candidate. Under the defendant's argument, even if Chief Land told the Police Commissioners he was ranking the older candidates lower and the younger candidates higher solely due to their ages, the Town of Weston would be immune from liability for age discrimination because Chief Land did not make the final selection.

In Rose v. New York City Board of Education, 257 F.3d 156 (2d Cir. 2001), the plaintiff, a school principal, claimed that her supervisor, the School Superintendent, threatened on two occasions to replace her with someone "younger and cheaper." Id. at 158. At the end of the academic year during which the comments were made, the Board

28

of Education demoted the plaintiff to Assistant Principal. Id. at 158-59. Even though the School Superintendent did not have the authority to demote her, the Second Circuit held that the Superintendent's comments were direct evidence of a discriminatory animus toward the plaintiff, reasoning the Superintendent's comments "were not the stray remarks of a colleague but, rather, were comments made directly to her on more than one occasion by her immediate supervisor, who had enormous influence on the decision-making process." Id. at 162; See also, Bergene v. Salt River Project Agriculture Improvement and Power District, 272 F.3d 1136 (9th Cir. 2001) ("even if a manager was not the ultimate decision maker [in denying the plaintiff a promotion], that manager's motive may be imputed to the company if the manager was involved in the hiring decision."); Stacks v. Southwestern Bell Yellow Pages, 27 F.3d 1316, 1323 (8th Cir. 1994); Simpson v. Diversitech Gen. Inc., 945 F.2d 156, 160 (6th Cir. 1991) (a supervisor's racial bias was evidence of discrimination and "the fact that [the supervisor] did not 'pull the trigger' is of little consequence").

Where, as here, a supervisory employee with a discriminatory animus against older workers had substantial influence on the formal decision maker, the employer should not be able to shield itself from liability by hiding behind the formal decision maker. "On a motion for summary judgment, the Court does not act as the ultimate finder of fact. As the Second Circuit has emphasized, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Foster-Bey v. Potter, 296 F.Supp. 2d 195, 206 (D. Conn. 2003).

### C. THERE IS A QUESTION OF FACT AS TO WHETHER THE PLAINTIFF HAS A "LEARNING DISABILITY"

Connecticut General Statutes, §46a-60(a), provides that it is discriminatory for "an employer ... to discharge from his employment any individual ... because of the individual's ... learning disability." According to Connecticut General Statute §46a-51(19) a person with a learning disability is defined as "an individual who exhibits a severe discrepancy between educational performance and measured intellectual ability and who exhibits a disorder in one or more of the basic psychological processes involved

29

in an understanding or in using language, spoken or written, which may manifest itself in a diminished ability to listen, speak, read, write, spell or do mathematical calculations."

To establish a prima facie case of disability discrimination under the Connecticut Fair Employment Practices Act ("CFEPA"), a plaintiff must show that: (1) he was a member of a protected group; (2) he was qualified for the job; (3) he suffered an adverse employment decision; and (4) the adverse employment decision occurred under circumstances giving rise to a reasonable inference of discrimination. Conn. Gen. Stat. §46a-60(a)(1); See Feathers v. Vivisection Investigation League, Inc., 2000 WL 1340365 (Conn. Super Ct. 2000); Gilman Bros. v. Conn. Bros. v. Conn. Commission on Human Rights & Opportunities, 1997 WL 275578 (Conn. Super. Ct. 1997) (annexed as Exhibit 24). In the absence of direct evidence, Connecticut courts are to employ the McDonnell Douglas model of analysis. See Ann Howard's Apricots Rest., Inc. v. CHRO, 237 Conn. 209, 224-25 (1996).

### (1) The Plaintiff Has A Disability As Defined Under The Connecticut Fair Employment Practices Act

To establish the first prong of the McDonnell Douglas test in a disability discrimination case, the plaintiff must establish that there is a question of fact as to whether he has a "disability" under Connecticut law. In support of its contention that the plaintiff is not disabled, the defendant points to the plaintiff's admission that "his alleged condition has not limited his ability to work in any manner." Def. Mem. of Law at 34. The defendant attempts to engraft a requirement into the CFEPA that only exists as just one of several possible types of "major life activities" under the ADA. The ADA's definition of "disability" requires an individual to show that he is substantially limited in one or more "major life activities," such as caring for oneself, performing manual tasks, walking, seeing, breathing, learning or working. 29 C.F.R. § 1630.2(i). Therefore, the ADA lists working as just one of several possible major life activities which could lead to that impairment falling within the ambit of the ADA's definition of the term "disability."

Officer Filush is not alleging that he has a "disability" under the ADA. Rather, he is only claiming he has a "disability" under the Connecticut state law's much broader definition of the term. To be "disabled" under Connecticut law is different from being "disabled" under the Americans with Disabilities Act, 42 U.S.C. §12101 et. seq.

30

("ADA"). See Shaw v. Greenwich Anesthesiology Assocs., P.C., 137 F. Supp. 2d 48, 65 (D. Conn. 2001). In fact, this court recognized in Connor v. McDonald's Restaurant, 2003 WL 1343259 (D. Conn.) (annexed as Exhibit 25), that Connecticut's definition of the term "disability" is broader than the ADA's definition of the term. Id. at *5.

In Shaw, the district court dismissed a plaintiff's ADA claim on summary judgment after finding that her arthritis did not substantially limit a major life activity. However, the court refused to grant summary judgment with respect to the plaintiff's CFEPA claim, reasoning that "[t]o be 'disabled' under Connecticut law is different from being 'disabled' under the ADA." 137 F.Supp. 2d at 65. The district court in Shaw relied on Venclauskas v. State of Connecticut Dep't of Public Safety, No. CV 960471879, 1997 Conn. Super. LEXIS 1643, 1997 WL 375654 (Conn. Super. 1997) (annexed as Exhibit 26), where the Connecticut Superior Court rejected a defendant's assertion that a CFEPA plaintiff, "by analogy to federal anti-discrimination statutes," could not be considered disabled within the meaning of the CFEPA. Id. at *1. Instead the state court held that plaintiff had alleged sufficient facts to support a finding that he was disabled within the meaning of Connecticut state law. Id. at *3, 6-7. In Venclauskas v. State of Connecticut Dep' of Public Safety, 921 F.Supp. 78, 82 (D. Conn. 1995), the District Court held that the plaintiff's eye impairment was not a disability under the ADA. The plaintiff was rejected for a position as state police trooper trainee because of his unaided visual acuity of 20/80 in his left eye and 20/120 in his right eye. Id. at 80. The court held that the plaintiff was not substantially limited in a major life activity because his condition was not severe and did not limit him from employment in general. However, the state court in Venclauskas rejected the defendant's argument that the plaintiff did not have a disability under the CFEPA because the U.S. District Court held that he did not have a "disability" under the ADA. 1997 WL 375654 at *6-7.

In CHRO ex rel Knowles v. Gilman Brothers Co., Case No. 9240221(Hearing Officer Decision, 1995), confirmed on appeal, Gilman Brothers Co. v. CHRO, 1997 Conn. Super. LEXIS 1311, 1997 WL 275578 (Conn. Super. Ct. 1997) (annexed as Exhibit 24), the CHRO looked at the differences between the Connecticut state law and federal ADA definitions of "disability" and concluded that carpel tunnel syndrome was a disability under Connecticut state law even though it would not be a disability under the

ADA. The CHRO Hearing Officer observed that "[t]he federal ADA apparently required a more serious condition and, therefore, complainant's disability does not fall within its purview." Id. at 3.

Both Connecticut's courts and the CHRO have repeatedly held that a variety of physical infirmities or impairment met the CREPA's definition of "disability" even though those impairments would not meet the stringent definition of disability under the ADA. In Adriani v. CHRO, 220 Conn. 307, 596 A.2d 426 (1991), for example, the court held that an individual whose hypertension caused him to miss two weeks of work had a disability under the CFEPA. Id. In contrast, courts have routinely held that hypertension is not a disability under the ADA. See Murphy v. United Parcel Service, 527 U.S. 516, 523-25 (1998); Oswalt v. Sara Lee Corp., 74 F.3d 91, 92 (5th Cir. 1995); Deghard v. WalMart Stores, 926 F. Supp. 1002, 1012-13 (D. Kan. 1996).

The CHRO has also repeatedly held that a variety of conditions met the CFEPA's definition of "disability" even though the condition at issue was not particularly severe. See, e.g., Gilman Brothers v. CHRO, 1997 Conn. Super. LEXIS 1311 (May 13, 1997) (annexed as Exhibit 24) (immediate onset of carpel tunnel syndrome); Damiano v. Ethan Allen Inn, CHRO No. 8420259 (1987) (annexed as Exhibit 27) (four months of active breast surgery cured by surgery and radiation); Frankel v. Doctors Pharmacy, CHRO No. 7820239 (1997) (annexed as Exhibit 28) (five months of cardiac symptoms after heart attack); CHRO ex rel Corner v. Town Of Stratford, CHRO No. FEP-AGE-75-2 (1981) (annexed as Exhibit 29) (existence of hypertension without any evidence of active disease); Williams v. Town of Stratford, CHRO No. 850296 (1990) (annexed as Exhibit 30) (history of prior spinal surgery, but no active impairments).

The defendant next contends that "the plaintiff was not diagnosed with dyslexia or any learning disability...." Def. Mem. of Law at 34. The defendant relies on Neurophysiologist Kimberlee J. Sass' report that the plaintiff does not having a learning disability. The defendant completely ignores Dr. Robert S. Kruger's assessment that "Mr. Filush's reading recognition skills are in the very low average range (34th %) which suggests dyslexic impairment in an otherwise competent individual." See Exhibit 11. Dyslexia is a learning disability that is a "specific language-based disorder of constitutional origin characterized by difficulties in single word decoding." Exhibit 31;

32

Article by Bright Solutions for Dyslexia. Dyslexia is an inherited condition which "interferes with the acquisition and processing of language." See Exhibit 31.

Individuals with dyslexia have been recognized by courts to possess a disability, as defined by the broader definition of "disability" under the ADA and Section 504. For example, in Bartlett v. New York State Board of Law Examiners, 2001 U.S. Dist. LEXIS 11926, 21 NDLRP 160 (S.D.N.Y.) (annexed as Exhibit 32), the district court, on remand from the Second Circuit, held that the plaintiff was an individual with a disability as defined by the ADA and Section 504 because her dyslexia substantially limited her in the major life activity of reading "when compared to most people by her slow reading rate and by the fatigue caused by her lack of automaticity." Id. at *30.

Dyslexia is merely one type of learning disability. The real question is whether the plaintiff has a "learning disability" as defined by Connecticut law. In order to be learning disabled under the CFEPA the plaintiff must exhibit a "severe discrepancy between educational performance and measured intellectual ability and ... exhibits a disorder in one or more of the basic psychological processes involved in an understanding or in using language, spoken or written, which may manifest itself in a diminished ability to listen, speak, read, write, spell or do mathematical calculations." Conn. Gen. Stat. §46a-51(19). According to Dr. Kruger, the plaintiff always had difficulty with standardized tests and had been a slow worker at all academic tasks. See Exhibit 11. Dr. Sass also observed that "a reasonable probability exists that the decline in the officer's achievement on the Verbal Meaning subtest of the PMAT was a byproduct of his learning disorder." Exhibit 33; Dr. Kimberly Sass Report dated November 14, 2003 at 10. A "PMAT" is a Primary Mental Abilities Test that assesses an individual's verbal skills. Dr. Sass also noted that, at one point during Officer Filush's childhood, he "would have met the diagnostic criteria for Reading Disorder of Written Expression...." See Exhibit 33 at 9. Dr. Kruger stated that the plaintiff had two children with learning disabilities and that learning disabilities are usually hereditary. See Exhibit 11. Dr. Kruger concluded that the plaintiff's reading recognition skills were in the very low average range which suggested to him that the plaintiff had a learning disability. See Exhibit 11. Dr. Kruger also stated that the plaintiff's visual memory skills were impaired and that this deficit would slow down the plaintiff's performance on any written task

requiring rapid execution. See Exhibit 11. Dr. Kruger suggested that the plaintiff was at a clear disadvantage on any standardized examination to other candidates who were not disabled. He also indicated that a reasonable accommodation for the plaintiff's disability would have to include being provided extended time on examinations. See Exhibit 11.

While the defendant's expert, Dr. Sass, clearly disagrees with Dr. Kruger's conclusion that the plaintiff may have dyslexia, even Dr. Sass acknowledged the plaintiff might have a learning disorder. Exhibit 33 at 10. Dr. Sass and Dr. Kruger's disagreement about whether the plaintiff has dyslexia does not prove that, as a matter of law, Mr. Filush does not have a "learning disability" under the CFEPA. Rather, it demonstrates that there is a question of fact as to whether there is a "severe discrepancy between [the plaintiff's] educational performance and [his] measured intellectual ability" as is required under the CFEPA.

### D. THE DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S RETALIATION CLAIM UNDER THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT

The CFEPA provides that "[i]t shall be a discriminatory practice ... [f]or [an] employer ... to discharge, expel or otherwise discriminate against any person because he has opposed any discriminatory employment practice or because he has filed a complaint or testified or assisted in any [applicable] proceeding ...." Conn. Gen. Stat. §46a-60(4). According to the Second Circuit in Richardson v. New York State Dep't of Correctional Services, 180 F.3d 426 (2d Cir. 1999), "we evaluate retaliation claims under the burden shifting rules established by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." Id. at 441. According to Richardson, "in the context of a motion for summary judgment, the plaintiff must first demonstrate a prima facie case of retaliation, after which the defendant has the burden of pointing to evidence that there was a legitimate, nonretaliatory reason for the complained of action. If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Id.

34

To establish a prima facie case of retaliation a plaintiff must show (1) participation in a protected activity that is known to the defendant; (2) an employment decision or action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse decision. See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir. 1996).

### (1)   The Plaintiff Established A Prima Facie Case Of Retaliation.

The defendant first argues that the plaintiff has failed to establish a prima facie case of retaliation because "there is no evidence of a causal connection between the plaintiff's filing of the CHRO complaint and the alleged failure to promote, which occurred two months earlier in September 2002." Def. Mem. of Law at 36. However, the plaintiff never contended that he was retaliated against as a result of filing a CHRO complaint. The plaintiff alleged that he was retaliated against for requesting a reasonable accommodation for his disability, which is a protected activity. Complaint ¶74.

In Bayonne v. Pitney Bowes Inc., No. 3:03CV712, Slip Op. (D. Conn. January 27, 2004) (annexed as Exhibit 34), the plaintiff argued that her request for benefits from defendant's short-term disability program is a protected activity under the ADA. The plaintiff argued that the short-term disability benefits are a "reasonable accommodation" under the Act. The court, relying on Conley v. United Parcel Services, 88 F.Supp.2d 16, 20 (E.D.N.Y. 2000), concluded that a request for a reasonable accommodation is a protected activity. Id. at *2. In Weixel v. Board of Educ. of City of New York, 287 F.3d 138 (2d Cir. 2002), the Second Circuit also concluded that "[the] plaintiffs do allege that they were seeking reasonable accommodation of [Plaintiff's] disability--which constitutes protected activity under Section 504/ADA." Id. at 149 (citing Muller v. Costello 187 F.3d 298, 311 (2d Cir. 1999) ("retaliation claim can be based on, inter alia, request for reasonable accommodation")).

The defendant next contends that "the plaintiff has failed to produce any evidence of a causal connection between the plaintiff's January 6, 2000 request for testing accommodations and the April 17, 2000 and September 2002 promotional examinations." Def. Mem. of Law at 36. The defendant relies on Tenth and Seventh Circuit cases to support its contention that "twenty months, four months and even three months have been held to be insufficient." Def. Mem. of Law at 37. The Second Circuit "has not drawn a

35

bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Coop Extension, 252 F.3d 545, 554-555, n.5 (2d Cir. 2001). The Second Circuit in Gorman-Bakos extensively looked at other retaliation cases, in general, and Second Circuit retaliation cases, in particular, in assessing proximity. The court found the following:

- Twelve (12) days between alleged sexual harassment and discharge could suggest a causal relationship. Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996);

- Discriminatory acts within one month of receipt of disposition notices may be retaliation for initiation of lawsuit more than one year earlier. Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446-47 (2d Cir. 1999);

- Discharge less than two months after plaintiff filed a sexual harassment complaint with management and ten days after filing complaint with state human rights office provided prima facie evidence of a causal connection between protected activity and retaliation. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998);

- Eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship. Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980);

Id. at 554; see also Hernandez v. Kellwood Co., 99 Civ. 10015, 2003 WL 22309326 at *20 (S.D.N.Y.) (annexed as Exhibit 16) (where plaintiff was fired five months after filing her EEOC charge, court found "a close enough temporal connection to establish the forth prong of the prima facie case."); Suggs v. Port Auth. Of New York & New Jersey, 97 Civ. 4026, 1999 WL 269905 at *6 (S.D.N.Y.) (annexed as Exhibit 17) (six-month gap between EEOC charge filing and termination close enough to raise inference of retaliation).

In January 2000, Officer Filush was told by Dr. Kruger that he had a learning disability. Complaint ¶ 9. As a result of this knowledge, Officer Filush contacted Chief Land and requested, as a reasonable accommodation, extended time on the 2000 Sergeant examination. Chief Land rebuffed the plaintiff stating, "you're too smart to have a disability." Complaint ¶32. After corresponding with Dr. Kruger, Chief Land reluctantly

36

permitted Officer Filush an addition hour on the examination. Despite being one of the top three candidates, Officer Sergeant was not promoted to Sergeant.

On or about July 24, 2002, the plaintiff sent a letter to Chief Land requesting testing accommodations for the Sergeant's examination to be held on or about August 6, 2002. The plaintiff indicated in his letter that he believed he was entitled to similar testing accommodations that had been previously extended to him. Complaint ¶51. Officer Filush never received a response from Chief Land. However, Officer Filush was again given an additional hour to take the written part of the examination.

Less than two weeks after he requested an accommodation, Chief Land told Commissioner Goldberg that morale would improve in the department if they got "rid of the old guys." See Exhibit 5 at 74. Commissioner Goldberg interpreted Chief Land's statement to refer to age, stating "I took it to mean age. Senior and junior, long service, short service, means something different. Old and young in the context it was used meant old and young." See Exhibit 5 at 75. Commissioner Goldberg also believed that Chief Land was referring to Officer Filush and Officer McInnis because "that's who [Chief Land] was talking about [McInnis] ... and my view was [Chief Land] was talking about Filush and McInnis." See Exhibit 5 at 89.

On August 6, 2002, approximately one week after Chief Land's assertion that the department needed to get rid of the "old guys," the Commissioners had a discussion about why Officer Filush had been denied the Field Training Officer position. See Exhibit 8, ¶ 9. Chief Land indicated that he did not want the "old guys" even to train the "young guys" and added "you know his [Filush's] bad attitude." See Exhibit 8, ¶ 9.

By the end of August 2002, less than a month after Officer Filush requested extra time on the 2002 Sergeant examination as a reasonable accommodation, and only a few weeks after Chief Officer made derogatory age related comments, Officer Filush learned that he did not "qualify" for consideration for Sergeant. Officer Filush was then told that his oral score on the examination was reduced because he was "less than truthful" on his resume. Complaint ¶58. Chief Land said that the plaintiff listed an incomplete Master's Program on his resume. Complaint ¶58. There was nothing "untruthful" about the plaintiff's resume. Officer Filush's resume does not claim that he received his Master's Degree. Rather, it states, "University of New Haven, Masters Program – Public

37

Administration – not completed." See Exhibit 7. There is a question of fact as to whether Chief Land's statements and actions were intended to retaliate against the plaintiff because he sought a reasonable accommodation.

### (2) Defendant's Legitimate, Non-Discriminatory Reason For Its Actions Are Pretextual

The defendant reiterates its argument that the plaintiff was not "qualified" for the position of Sergeant because he was not one of the top three candidates. As the plaintiff discusses in greater detail in Section IV, subsection B(2)(a), the plaintiff did not "qualify" as one of the top three candidates for the position of Sergeant in 2002 because Chief Land influenced and manipulated the candidates scores to assure that John Filush did not end up as one of the three finalists to be considered for the promotion to Sergeant and to pave the way for the 37-year-old Patrick Daubert to be selected.

### E. THIS COURT CAN EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS EVEN THOUGH PLAINTIFF'S FEDERAL CLAIM WAS DISMISSED

Even though this court granted summary judgment on Plaintiff's federal claim, 28 U.S.C. § 1367(c)(3) gives the courts discretionary authority to retain jurisdiction over pendent state law claims. As a general rule, "the district courts may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction, [even though] it cannot exercise supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction." Parker v. Della Rocco, 252 F.3d 663, 666 (2d Cir. 2001) (quoting Norwalk v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996)).

The court, in its discretion, should retain jurisdiction over the plaintiff's state law claims if the plaintiff's federal claims are dismissed on this motion for summary judgment.

### F. THE PLAINTIFF WITHDRAWS HIS CLAIM FOR PUNITIVE DAMAGES. HOWEVER, THE QUESTION OF WHETHER HE IS ENTITLED TO RECOVER LIQUIDATED DAMAGES IS A QUESTION OF FACT. PLAINTIFF IS ENTITLED TO ATTORNEY'S FEES UNDER CONN. GEN. STAT. §46a-104.

38

The defendant contends that it can not be liable for liquated damages under the ADEA because "there is no evidence Land had knowledge his purported remarks were violative of the ADEA." Def. Mem. of Law at 39. However, the question of whether or not Chief Land willfully violated the ADEA is a question of fact that can not be resolved on a motion for summary judgment. A willful violation of the ADEA requires the plaintiff to show that that the employer either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Fink v. City of New York, 129 F.Supp.2d 511, 523 (citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 126 (1985); Reichman v. Bonsignore, Brignati & Mazzotta, P.C., 818 F.2d 278, 281 (2d Cir. 1987); McGinty v. State, 193 F.3d 64, 70 (2d Cir. 1999)). The defendants need not have actual knowledge of the laws provisions in order to violate it. Id. Whether Chief Land acted with reckless disregard for the ADEA is a question of fact which can not be decided on a motion for summary judgment.

The Second Circuit has observed that individuals accused of employment discrimination "rarely admit to having said or, done what is alleged." (Danzer v. Nordan Systems, Inc., 151 F.3d 50, 57 (2d Cir. 1998) and is "hidden under a veil of self-declared innocence." Rosen v. Thornburg, 928 F.2d 528 (2d Cir. 1991)). Therefore, the plaintiff's failure to extract an admission that Chief Land knew his statements violated the ADEA does not mean a jury could not reach that conclusion.

Although the plaintiff does not necessarily agree with the defendant's argument that punitive damages are not an available remedy under the CFEPA against a municipality, he withdraws his claim for punitive damages.

The defendant argues that, because the plaintiff is not entitled to Connecticut common law punitive damages, it follows that he is also not entitled to statutory attorney's fees. However, the plaintiff has a statutory right to attorney's fees if he prevails. Conn. Gen. Stat. §46a-104 provides that a prevailing plaintiff may recover attorney's fees. Therefore, even if the defendant's status as a municipality renders it immune from liability for common law punitive damages, the defendant is not immunized from having to pay a statutory attorney's fee award.

**V.   CONCLUSION**

For all the foregoing reasons, the plaintiff requests that the court deny the defendants' motion for summary judgment.

THE PLAINTIFF,
JOHN FILUSH

By _____

Gary Phelan (CT 03670)
Tammy Marzigliano (CT 23326)
Outten & Golden LLP
Four Landmark Square
Suite 201
Stamford, CT 06901
(203) 363-7888

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was mailed, first-class, postage prepaid on July 23, 2004 to:

Martha A. Shaw
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

_____
Gary Phelan